22 CV 00861

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JUDGE CASTEL ------------------------------------------x

DOC #_____

Case No. _____

UNITED STATES OF AMERICA *ex rel.*

[UNDER SEAL],

                              Plaintiffs,

           vs.

**COMPLAINT FOR VIOLATIONS OF
FEDERAL CIVIL FALSE CLAIMS ACT**
[31 U.S.C. §§ 3729, *et seq.*]

**JURY TRIAL DEMAND**

**(FILED *IN CAMERA* AND UNDER SEAL)**

[UNDER SEAL],

                              Defendant.

----------------------------------------------------x

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------x

UNITED STATES OF AMERICA
ex rel. STEPHEN SISSELMAN, D.O.,

                            Plaintiffs,

        vs.

ZOCDOC, INC.,

                            Defendant.

------------------------------------------------------x

Case No. _____

COMPLAINT FOR VIOLATIONS OF
FEDERAL CIVIL FALSE CLAIMS ACT [31
U.S.C §§ 3729 *et seq.*]

JURY TRIAL DEMANDED

**(FILED *IN CAMERA* AND UNDER SEAL)**

        Plaintiff-Relator Stephen Sisselman, D.O., through his attorneys of record, on behalf of

the United States of America, for his Complaint against Defendant Zocdoc, Inc. ("Zocdoc"),

alleges as follows:

## I.    NATURE OF THE ACTION

        1.      This is an action to recover damages and civil penalties on behalf of the United

States of America arising from false and/or fraudulent statements, records, and claims made and

caused to be made by Defendant and/or its agents, employees and co-conspirators in violation of

the Federal False Claims Act, 31 U.S.C. §§ 3729, *et seq.*

        2.      As detailed below, from at least in or about 2019 through the present, Zocdoc has

knowingly engaged in a scheme that, on information and belief, caused substantial losses to

Federal Health Care Programs, including Medicare and Medicaid, by causing those programs to

pay for claims arising from Zocdoc's systematic violation of the Federal Anti-Kickback Statute

(42 U.S.C. § 1320a-7b(b)) ("AKS").

3.      Zocdoc operates an online platform through which patients may search and book medical appointments with providers. Patients may search for a provider by name, or by other criteria such as medical specialty and zip code to generate search results of providers in the patient's geographic area. Zocdoc utilizes a proprietary algorithm to filter, prioritize and, at times, block out the providers who appear in the search results. The patient's insurance information is also captured by Zocdoc as part of the new patient booking process.

4.      Zocdoc charges nothing to the patients who use its platform, but it does charge medical providers at least two different fees. One fee is an annual "subscription fee" of $299, which is supposed to permit a provider to be listed on Zocdoc's platform. The other fee, which Zocdoc began instituting for Federal Health Care Program beneficiaries in or about 2019, is a "booking fee" – starting at $35 and, on information and belief, rising from there to as high as $110, depending on geographic location and medical specialty – that is charged for each new patient choosing to book with a provider through Zocdoc. Zocdoc does not charge a "booking fee" for existing patients of the provider who book appointments through Zocdoc, and also does not charge a "booking fee" if a new patient cancels the appointment less than 24 hours after booking it. If a provider wishes to limit the amount paid for new patients on a monthly basis, Zocdoc allows the provider to set a monthly cap on the amount the provider wishes to pay Zocdoc for new patient "booking fees."

5.      As alleged below, Zocdoc's solicitation and receipt of a "booking fee" for each new patient it refers to a provider through its online platform is an unlawful kickback that violates the AKS. The evidence detailed below overwhelmingly demonstrates that at least one purpose of Zocdoc's "booking fee" is to illegally reward Zocdoc for: (1) referring Medicare, Medicaid and other Federal Health Care Program beneficiaries to medical providers willing to

pay the fee for each new patient booked through Zocdoc; (2) misleading new patients about the availability of non-paying providers in order to steer them to paying providers for booking appointments; and (3) manipulating provider search results so as to prioritize and recommend to potential patients those medical providers who choose (and are able) to pay Zocdoc more money in new patient "booking fees," while filtering out of Zocdoc search results all other medical providers who are not willing (or are unable) to pay such fees and/or who have exceeded their monthly cap on such fees until the provider authorizes more spending to raise the cap, at which point the provider's eligibility to appear in Zocdoc search results is restored.

6.      The net result of this unlawful arrangement is that Zocdoc rewards and prioritizes doctors who pay it for direct access to, and referrals of, federal healthcare beneficiaries

7.      All claims submitted to Federal Health Care Programs arising from Zocdoc patient referrals in violation of the AKS constitute "false and fraudulent" claims under the Federal Civil False Claims Act ("FCA"), 31 U.S.C. §§ 3729, *et seq*. Such claims cheat the government and unlawfully enrich Zocdoc.   Therefore, Plaintiff-Relator Stephen Sisselman, D.O. seeks to recover all available damages, civil penalties, and other relief for violations alleged herein.

## II.    PARTIES

8.      Plaintiff-Relator Stephen Sisselman, D.O. is a physician licensed to practice in New York State. Relator, who has been enrolled as a Zocdoc provider since 2014, has knowledge of the facts on which the allegations herein are based.

9.      Defendant Zocdoc, Inc. is a for-profit corporation formed under the laws of Delaware and authorized to do business in New York State.   Zocdoc has a principal business address of 568 Broadway, 2nd Floor, New York, NY 10012.  On its website, Zocdoc describes

itself as a technology company that offers a digital marketplace which connects patients and doctors. According to Zocdoc, each month millions of patients across the United States search its digital marketplace and book medical appointments with providers.

**III.    JURISDICTION AND VENUE**

10.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1367, and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730. Under 31 U.S.C. § 3730(e), there has been no statutorily relevant public disclosure of the "allegations or transactions" in this Complaint. Relator is the original source of the facts and information alleged in this Complaint. Relator voluntarily provided the information on which his allegations are based to the government before filing this action. That information, which Relator obtained by virtue of his customer relationship with Zocdoc, has never been publicly disclosed within the meaning of 31 U.S.C. § 3730(e)(4)(A).

11.    This Court has personal jurisdiction over the Defendant pursuant to 31 U.S.C. § 3732(a), because that section authorizes nationwide service of process and because the Defendant has minimum contacts with the United States. Moreover, the Defendant can be found in this District and transacts business in this District.

12.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and 1395(a) and 31 U.S.C. § 3732(a), because the Defendant can be found in and transact business in this District. At all times relevant to this Complaint, Defendant regularly conducted substantial business within this District, maintained employees in this District and can otherwise be found and resides in this District. In addition, statutory violations, as alleged herein, occurred in this District.

## IV.    APPLICABLE LAW

### A.        The False Claims Act

13.    The FCA was originally enacted during the Civil War and was substantially amended in 1986. Congress enacted the 1986 amendments to enhance and modernize the government's tools for recovering losses sustained by frauds against it. The amendments were intended to create incentives for individuals with knowledge of fraud against the government to disclose the information without fear of reprisals or government inaction, and to encourage the private bar to commit resources to prosecuting fraud on the government's behalf.

14.    The FCA prohibits knowingly presenting or causing to be presented to the federal government a false or fraudulent claim for payment or approval. 31 U.S.C. § 3729(a)(1)(A). Additionally, it prohibits knowingly making or using a false or fraudulent record or statement "material to a false or fraudulent claim" paid or approved by the federal government, or "material to an obligation to pay" money to the government. 31 U.S.C. § 3729(a)(1)(B). Under the FCA, "knowingly" means acting with actual knowledge, deliberate ignorance or reckless disregard of the truth or falsity of the information. 31 U.S.C. § 3729(b)(1).

15.    Pursuant to 31 U.S.C. § 3729(a)(1)(B), a false or fraudulent statement or record that is made for the purpose of causing the government to pay a claim, even if the fraudulent statement or record is not proffered directly to the government, is still actionable where there is some nexus between the statement or record and the payment of the claim. Furthermore, both affirmative misrepresentations and the omission of facts material to a governmental decision to pay can render a claim false under the FCA.

16.    The FCA further defines a false claim to include knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money or

property to the government. 31 U.S.C. § 3729(a)(1)(G). This is known as the "reverse false claim" provision of the FCA. "Obligation" is broadly defined under the FCA to include "the retention of any overpayment." 31 U.S.C. § 3729(b)(3).

17.      In 2010, the Affordable Care Act changed federal law governing the receipt of Medicare and Medicaid funds to provide that "[a]n overpayment must be reported and returned" within "60 days after the date on which the overpayment was identified" and that failure to do so breaches an "obligation" under the FCA. 42 U.S.C. § 1320a-7k(d). The statutory scheme creates an independent legal obligation under the FCA to return overpayments. The knowing failure to repay Medicare and Medicaid overpayments within 60 days as required by the law constitutes a false claim in violation of 31 U.S.C. § 3729(a)(1)(G).

18.      The FCA prohibits knowingly presenting or causing to be presented to the federal government a false or fraudulent claim for payment or approval. 31 U.S.C. § 3729(a)(1)(A). Additionally, it prohibits knowingly making or using a false or fraudulent record or statement "material to a false or fraudulent claim" paid or approved by the federal government, or "material to an obligation to pay" money to the government and further prohibits knowingly concealing and improperly avoiding or decreasing "an obligation to pay" money to the government. 31 U.S.C. § 3729(a)(1)(B), (G).  Pursuant to 31 U.S.C. § 3729(a)(1)(B), a false or fraudulent statement or record that is made for the purpose of causing the government to pay a claim, even if the fraudulent statement or record is not proffered directly to the government, is still actionable where there is some nexus between the statement or record and the payment of the claim.  Furthermore, both affirmative misrepresentations and the omission of facts material to a governmental decision to pay can render a claim false under the FCA.  The FCA also prohibits two or more parties from conspiring to violate any of the liability provisions of the statute. 31

U.S.C. § 3729(a)(1)(C).  A false claim is made "knowingly" if it is made with actual knowledge, or in deliberate ignorance or reckless disregard of the truth or falsity of information. 31 U.S.C. § 3729(b)(1).

19.     Any person who violates, or conspires to violate, the FCA is liable for a civil penalty of up to $11,000 per claim for claims made on or after September 29, 1999 (and up to $23,331 per claim for claims made after November 2, 2015), plus three times the amount of the damages sustained by the United States. 31 U.S.C. § 3729(a).

20.     The FCA does not require direct contact between a defendant and the government.  By its terms, the FCA imposes liability on any person who presents or causes to be presented a false or fraudulent claim to the government (or false statement in support of a false or fraudulent claim). 31 U.S.C. § 3729(a).

21.     To "cause" an FCA violation, it is not necessary that a defendant's fraudulent conduct be the last in the series of events that results in financial loss to the government. As applied by the courts, the standard for "causation" under the FCA is whether the submission of a false or fraudulent claim was "reasonably foreseeable" from a defendant's actions. Under this standard, a defendant's fraudulent conduct can occur anywhere in the chain of events leading to financial loss by the government, and can be an indirect, as well as direct, cause of the loss. Moreover, the defendant need not be the recipient or beneficiary of the false claim. All that is required is that the defendant, by its fraudulent conduct, set in motion a series of events which results in a reasonably foreseeable loss to the government.

22.     The FCA defines a "claim" to include any request or demand, whether under contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States government provides any portion of the money or property which is

requested or demanded, or if the government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested.

23.     The FCA allows any person having information about an FCA violation to bring an action on behalf of the United States, and to share in any recovery. The FCA requires that the complaint be filed under seal for a minimum of 60 days (without service on the defendants during that time) to allow the government time to conduct its own investigation and to determine whether to join the suit.

**B.     The Federal Health Care Programs**

24.     The health care programs described in the paragraphs below, and any other government-funded healthcare programs, shall be referred to as "Federal Health Care Programs."

25.     The Medicare Program, Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395, *et seq.* ("Medicare") is a health insurance program administered by the United States that is funded by taxpayer revenue.  Entitlement to Medicare is based on age, disability and/or affliction with certain diseases.  The program is overseen by the United States Department of Health and Human Services ("HHS") through the Centers for Medicare and Medicaid Services ("CMS").  Medicare provides for payment of hospital services, medical services, durable medical equipment and prescription drugs on behalf of Medicare-eligible beneficiaries.

26.     Part A and B of the Medicare Program are known as "traditional" Medicare. Medicare Part A covers inpatient and institutional care.  Medicare Part B covers physician, hospital outpatient, and ancillary services and durable medical equipment.  Under Medicare Parts A and B, CMS reimburses healthcare providers (e.g., hospitals and physicians) using what is known as a fee-for-service ("FFS") payment system.  Under a FFS payment system, healthcare providers submit claims to CMS for reimbursement for each service, such as a physician office

8

visit or a hospital stay. CMS then pays the providers directly for each service. Under Medicare Part C (the "Medicare Advantage Program"), Medicare beneficiaries can opt out of the traditional Medicare Program (Parts A and B) and instead enroll in and receive managed health care services from Medicare Advantage ("MA Plans"). MA Plans must provide Medicare beneficiaries all the services that they are entitled to receive from the traditional Medicare Program.

27.     The Medicaid Program, Title XIX of the Social Security Act, 42 U.S.C. §§ 1396-1396v ("Medicaid") is a health insurance program administered by the United States and individual states and is funded by federal, state and local taxpayer revenue.  The Medicaid Program is overseen by HHS through CMS.  Medicaid was designed to assist participating states in providing medical services, durable medical equipment and prescription drugs to financially needy individuals that qualify for Medicaid.  The Medicaid program pays for services pursuant to plans developed by the States and approved by HHS through CMS.  42 U.S.C. §§ 1396a(a)-(b).  States pay doctors, hospitals, pharmacies, and other providers and suppliers of medical items and services according to established rates. 42 U.S.C. §§1396b(a)(1), 1903(a)(1). The federal government then pays each state a statutorily established share of "the total amount expended ... as medical assistance under the State plan." See 42 U.S.C. §1396b(a)(1). This federal-to-state payment is known as Federal Financial Participation.  There also are a variety of Medicaid managed care organizations through which Medicaid benefits are administered to beneficiaries. As explained on the New York Department of Health website, "Managed Care is a general term used to describe any health insurance plan or system that coordinates care through a primary practitioner or is otherwise structured to control quality, cost and utilization, focusing on preventive care" and "Medicaid Managed Care (MMC) provides Medicaid state plan benefits to

enrollees through a managed care delivery system comprised of Managed Care Organizations (MCOs)." (*see* Medicaid Managed Care (MMC) Overview: (ny.gov)). MCOs generally must comply with the same rules and regulations that govern the Medicaid program.

28.     The federal health care program for the United States military (formerly known as the Civilian Health and Medical Program of the Uniformed Services or CHAMPUS, and now known as "TRICARE"), 10 U.S.C. §§ 1071-1106, provides benefits for health care services furnished by civilian providers, physicians and suppliers to active-duty service members and retirees of the seven uniformed services: Army, Marine Corps, Navy, Air Force, Coast Guard, Commissioned Corps of the Public Health Service and the Commissioned Corps of the National Oceanic and Atmospheric Association.   TRICARE is also available to immediate family members and survivors of military personnel.   The program is administered by the Department of Defense and funded by the federal government.   Among other things, this program pays for diagnostic laboratory testing for its beneficiaries.

29.     The Federal Employees Health Benefits ("FEHB") program is the largest employer-sponsored health insurance program in the world, covering more than 8 million Federal employees, retirees, former employees, family members, and former spouses. FEHB includes different types of plans: fee-for-service with a preferred provider organization; health maintenance organizations; point-of-service; high deductible health plans; and consumer-driven health plans. Benefits available include hospital care, surgical care, inpatient and outpatient care, obstetrical care, mental health and substance abuse care, and prescription drug coverage. The federal government contributes about 70% of the premium cost for this insurance.

**C.**        **False Claims and the Anti-Kickback Statute**

30.     The AKS prohibits the offer, payment, solicitation or receipt of any form of

remuneration (directly or indirectly, overtly or covertly, in cash or in kind) to induce or reward the referral of any individual for the furnishing of any item or service payable under a Federal Health Care Program, including Medicare and Medicaid. 42 U.S.C. § 1320a-7b(b).  Violation of the AKS is a felony punishable by a fine and up to 10 years imprisonment.

31.    The AKS is designed to guard against the steering of patients to particular providers, the overutilization of medical services and increased program costs, unfair competition and the corruption of medical decision-making.  U.S. Department of Health and Human Services, Office of Inspector General, *A Roadmap For Physicians: Avoiding Medicare and Medicaid Fraud and Abuse*, "Anti-Kickback Statute," at p.5.  Under the "one purpose" test, even a transaction with multiple legal purposes will violate the AKS if at least one purpose of the transaction is to induce or reward patient referrals.  *Dhaliwal v. Salix Pharmaceuticals, Ltd.*, 752 Fed.Appx. 99, 100 (2d Cir. 2019). Courts have uniformly held that, for purposes of the FCA, a provider's compliance with the AKS is highly material – indeed, it is a precondition – to the Government's payment of claims submitted to Federal Health Care Programs, including Medicare and Medicaid. *See, e.g., State v. MedImmune, Inc.*, 342 F.Supp.3d 544, 556 (S.D.N.Y. 2018).

32.    As further evidence of materiality, a "false or fraudulent claim" under the FCA is defined by statute to include any claim incorporating items or services resulting from a violation of the AKS:

> In addition to the penalties provided for in this section [i.e., 42 U.S.C. § 1320a-7b] ... a claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of [31 U.S.C. §§ 3729, et seq.]

42  U.S.C. § 1320a-7b(g).

33.     In view of the fact that claims violating the AKS are non-reimbursable, after the effective date of the Patient Protection and Affordable Care Act ("PPACA") on March 23, 2010, all amounts received in violation of the AKS also represent "overpayments" that, if not timely repaid, would become "false claims" by operation of law within the meaning of the FCA and PPACA. 31 U.S.C. § 3729(b)(3); 42 U.S.C. § 1320a-7k(d).

34.     It also bears emphasis that providers who enroll in Medicare must certify, among other things, that they will "abide by the Medicare laws, regulations and program instructions that apply to" them and their organizations and that they "understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations and program instructions (including, but not limited to, the Federal Anti-Kickback Statute, 42 U.S.C. section 1320a-7b(b) (section 1128B(b) of the Social Security Act) . . . ." Enrollees additionally certify that they "will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare and will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity." See Medicare Enrollment Application, Physicians and Non-Physician Practitioners, CMS-8551 at p. 23.

35.     Additionally, claims submitted to Medicare for payment, whether submitted on a paper claim form, or electronically, carry certifications of truth and accuracy.  The CMS-1500 claim form used to bill professional services under Medicare Part B, the electronic version of which includes the same data fields that appear on the paper form,  carries a certification that the billing information on the form is "true, accurate and complete," that the claimant has "familiarized [himself or herself] with all applicable laws, regulations, and program instructions," that the claimant has "provided or will provide sufficient information required to allow the government to make an informed eligibility and payment decision," and that the claim

"complies with all applicable Medicare and/or Medicaid laws, regulations, and program instructions for payment including but not limited to the Federal anti-kickback statute . . . ." See CMS-1500 Claim Form (Rev. (02-12)). The form further contains a notice that "[a]ny one who misrepresents or falsifies essential information to receive payment from Federal funds requested by this form may upon conviction be subject to fine and imprisonment under applicable Federal laws."

36.    Providers who enroll for the electronic submission of Medicare claims are likewise required to certify, among other things, that that their claims are "accurate, complete and truthful" and to "acknowledge that all claims will be paid from Federal funds, that the submission of such claims is a claim for payment under the Medicare program and that anyone who misrepresents or falsifies or causes to be misrepresented or falsified any record or other information relating to that claim . . . may, upon conviction, be subject to a fine and/or imprisonment under applicable Federal law." Medicare Claims Processing Manual, Chapter 24, 30.2; see also Fact Sheet, "Medicare Billing: Form CMS-1500 and the 837 Professional," Department of Health and Human Services, Centers for Medicare & Medicaid Services (July 2019); Electronic Data Interchange (EDI) Enrollment Form, at p. 2.

37.    As with Medicare, Medicaid claims explicitly and/or implicitly certify compliance with the AKS. *See, e.g.,* New York State Medicaid Program, eMedNY/Medicaid Management Information System, Certification Statement for Provider Billing Medicaid (requiring compliance with all rules and policies of the New York Department of Health and all federal and state laws and regulations).

38.    Given the indisputable and universally accepted materiality of AKS compliance to the Government's decision to pay Medicare, Medicaid and other Federal Health Care Program

13

claims, any such claim seeking Government payment that makes specific representations about items or services provided without also disclosing that such claim arose from an AKS violation is necessarily false and misleading within the meaning of *Universal Health Services v. United States ex rel. Escobar*, 136 S. Ct. 1989 (2016).

39.     As further detailed below, through its illegal solicitation and receipt of kickbacks in the form of "booking fees" from providers in return for referring and recommending new patients to providers for the furnishing of items and services reimbursable under Federal Health Care Programs like Medicare and Medicaid, Zocdoc caused the submission of an extraordinary number of false claims that violated both the AKS and the FCA. All submitted claims resulting from such illegal referral arrangements were: (1) false by operation of law (42 U.S.C. § 1320a-7b(g)); (2) legally false as violating express certifications of AKS compliance incorporated into the claims; and (3) impliedly false, as the failure to disclose that the claims arose from AKS violations rendered the claims materially false and misleading under the FCA.

## V.     **FACTS UNDERLYING THE FALSE CLAIMS SCHEME**

### A.  **The Evolution of Zocdoc's Illegal "Booking Fee"**

40.     Relator originally enrolled with Zocdoc in or about 2014. At that time, Zocdoc offered providers a flat fee of $3000 annually or $300 monthly in order to maintain an online profile and for receiving patient bookings through Zocdoc's online platform. That fee did not fluctuate with the number of new patients who booked with the provider through Zocdoc. Whether 1000 new patients booked through Zocdoc in a month, or just 10 new patients booked in that month, Zocdoc charged the provider the same flat fee for use of its online platform. Revealingly, in or about December 2016, Zocdoc advised Relator, in responding to an email inquiry concerning the possibility of a price discount, that Zocdoc's standardized, flat-fee price

14

was necessary in order to avoid kickback-related concerns.   Specifically, in emails dated December 8 and 15, 2016, a Zocdoc Account Manager advised Relator that "[s]ince we are a referral service, we need to steer away from charging by volume to avoid [the] Anti-Kickback Statute" and that "our legal team has set standard pricing for providers to be a part of the marketplace to avoid any comparison to charging per patient."

41.   Despite its prior admission concerning the legal perils under the AKS for a self-described "referral service" like Zocdoc to charge providers "by volume" or "per patient," in or about 2018, Zocdoc nonetheless began moving away from a flat-fee price model in favor of a per patient "booking fee" price model.  Zocdoc moved Relator over to this new price model as of January 2, 2020.  Zocdoc purported to justify its move to per patient charges on the ground that the flat fee price model allegedly presented an entry barrier to certain providers who could not afford the fee and gave an unfair advantage to those providers who heavily benefitted from Zocdoc-generated new patient bookings without having to pay more for that benefit. *See* Letter from Zocdoc Founder Oliver Kharraz, dated January 29, 2019, accessible at https://www.zocdoc.com/about/blog/company/nyupdate/.

42.   Initially, Zocdoc only applied the new price model to commercially insured patients, while it sought guidance from the federal government concerning how the AKS might apply to Zocdoc's new price model.  In or about September 2019, Zocdoc announced that it had received approval from the Office of Inspector General, Department of Health and Human Services ("OIG") to extend its per patient "booking fee" price model to beneficiaries of Federal Health Care Programs.  In an online statement, Zocdoc declared that it would now be extending its new patient price model to Medicare, Medicaid and Tricare beneficiaries. In making the announcement, Zocdoc declared that it appreciated OIG's approval "for new digital platforms

like Zocdoc, which empower patients and make healthcare more efficient" and that it would continue to press lawmakers "to modernize healthcare laws and regulations to preserve important protections and enable new innovations that America's healthcare system and patients so desperately need." Zocdoc Press Release, dated September 16, 2019, "A Victory for All Patients," accessible at https://www.zocdoc.com/about/news/update-federal-healthcare-programs/.

43.     What Zocdoc did not disclose, either to OIG when it sought and then obtained approval for its new per patient price structure, or to the patients using its platform, is that Zocdoc's per patient "booking fee" – which Zocdoc charges at rates varying from $35 for primary care providers to, on information and belief, as much as $110, depending on geographic location and medical specialty – purchases far more than just the convenience of booking a new patient appointment through Zocdoc's online platform.  The "booking fee" also purchases the new patient referral itself.  The reality is that the "booking fee" is an illegal kickback that is solicited and received by Zocdoc in return for: (a) sending new patients to some providers at the expense of others who are unwilling or unable to pay a new patient "booking fee" or who have exceeded an established monthly cap on such fees, (b) recommending and rewarding paying providers over non-paying providers, and (c) misleading new patients about the availability of non-paying providers in order to steer them to paying providers for booking appointments.

44.     Moreover, although Zocdoc represented to OIG that the "booking fee" had been determined by an independent valuation firm to be "fair market value" for the online scheduling service it was providing, Zocdoc's representation is, on information and belief, false since, among other things, the "booking fee" varies by medical specialty. Zocdoc's scheduling service is essentially a proprietary software product designed to facilitate the online booking of patient

appointments. In its public descriptions of the scheduling service, however, Zocdoc has not pointed to any increased booking complexity associated with certain medical specialties so as to justify varying rates, and all providers use the same Zocdoc booking software to schedule online appointments. Accordingly, Zocdoc charging more for specialists to use its booking service would be akin to Microsoft® charging higher prices to novelists using its word processing program Word®.  There is no obvious reason that scheduling an online appointment with a neurologist, orthopedist, radiologist or dermatologist should cost more than scheduling an online appointment with a primary care physician, unless in setting the fee Zocdoc is impermissibly taking into account the willingness of the provider to pay more for the patient referral (rather than the scheduling service) and/or the relative value of the patient referral (rather than the scheduling service) to the provider. Either approach is inconsistent with a "fair market value" fee under the AKS, which must be divorced from such illicit considerations. *See Bingham v. HCA, Inc.*, 783 F. App'x 868, 873 (11th Cir. 2019) (under AKS, any benefits received by providers in excess of the fair market value of their lease payments would be considered "prohibited remuneration"); OIG Special Fraud Alert, 59 Fed. Reg. 65372, 65377 (Dec. 19, 1994)  ("'fair market value'" must reflect an arms length transaction which has not been adjusted to include the additional value which one or both of the parties has attributed to the referral of business between them."). Furthermore, as Zocdoc knew when it sought OIG's approval for the "booking fee," OIG was required to accept Zocdoc's fair market value representation without analysis, as the agency is statutorily barred from opining on whether "fair market value shall be, or was paid or received for any goods, services or property." 42 U.S.C. § 1320a-7d(b)(3)(A).  This means, in turn, that OIG never analyzed or examined the question of fair market value in issuing its opinion, and that Zocdoc never received or relied upon OIG's views on that subject.

45.     Nor did Zocdoc disclose that its $299 annual "subscription fee" (or, as Zocdoc later called it, "practice fee") does not, in reality, purchase the right to be listed in Zocdoc search results for any provider who is not also paying Zocdoc "booking fees." Zocdoc, in effect, implemented a caste system for provider subscribers by offering an online presence with two tiers. Provider subscribers paying "booking fees" were permitted to be listed in search results and were fully visible to patients based on the search criteria entered. However, provider subscribers who were not paying "booking fees" were permitted only to maintain an "online profile" that would be accessible to patients who were specifically searching for them by name, but they were excluded by Zocdoc from all other provider search results generated by patients. This sleight of hand was never disclosed to regulators or to patients in presenting and promoting its online service but had a direct and adverse impact on the ability of patients to find and then independently schedule appointments with providers who were not paying "booking fees" to Zocdoc. In this way, among others, Zocdoc tied provider willingness to pay a "booking fee" to the provider's right to receive patient referrals, and not just to the provider's right to use Zocdoc's online patient scheduling service.

46.     Zocdoc falsely represented to OIG in seeking regulatory approval that patients alone, through search criteria entered by them, determine which providers appear in search results and that any provider paying Zocdoc an annual subscription fee to be listed on its platform could theoretically appear in those results if their characteristics matched the search criteria. Thus, according to the OIG Advisory Opinion cited by Zocdoc as allegedly approving its "booking fee" price model, Zocdoc represented to OIG, among other things, that:

- [Zocdoc] operates a platform through its website and mobile applications (collectively, the "Marketplace") that allows users, regardless of insurance status, to search and book medical appointments with healthcare professionals

that match the user's search criteria, which may include the services needed, a specified geographic area, a preferred appointment time, and the user's medical insurance.

- In response to a search, the Marketplace generates up to 200 organic, personalized search results listing Providers (the "Marketplace Results") using a proprietary algorithm, which filters and prioritizes Providers according to criteria set by users [i.e., patients] and other user-centric information, such as Providers' unconfirmed pending appointment bookings or cancellation rates. For example, depending on the criteria specified by users, Marketplace Results prioritize Providers who accept the user's insurance, offer services within the user's geographic area, and are available within the user's designated timeframe.

- If a user initiates a search on the Marketplace without specifying any search criteria, [Zocdoc] uses geotargeting to list Providers offering primary care services in the user's geographic area.

- **The algorithm does not filter or prioritize Providers listed in Marketplace Results based on the amount Providers pay [Zocdoc] or any other non-user-centric criteria.**

- [Zocdoc] is not a provider or supplier, is not affiliated with any Provider listed on the Marketplace, and does not expressly recommend any particular Provider to users.

- **Further, Providers' listings in Marketplace Results depend only on user-centric criteria, so the fees Providers pay, or would pay, [Zocdoc] would not affect the frequency with which Providers appear, or their placement, in Marketplace Results.**

OIG Advisory Opinion 19-04 (emphasis added).

47.     As further detailed below, all of these factual representations are false, since Zocdoc's patient-centric search criteria are *not* the sole determinants of provider search results on Zocdoc, those search results *are* influenced by how much providers pay Zocdoc in "booking fees," Zocdoc *does* filter and prioritize providers based on how much they are paying in

19

"booking fees" regardless of whether the provider is paying Zocdoc an annual "subscription fee" to be listed in search results and in total disregard of the search criteria entered by patients, and Zocdoc *does* expressly recommend certain providers by naming them in search results while filtering out others based on whether and/or how much they are paying Zocdoc in "booking fees." Given all these material falsehoods in the factual predicates underlying OIG's Advisory Opinion, the alleged regulatory approval which Zocdoc had trumpeted with so much fanfare in announcing the decision to charge a per patient "booking fee" never had any force or effect.[1]

48.     Likewise, in the "Frequently Asked Questions" section appearing on its website, Zocdoc tells patients using its platform that only user-centric criteria are determinants of provider search results, thereby falsely representing that Zocdoc is not filtering those results or otherwise interfering with patient choice based on unlawful financial considerations:

> How does Zocdoc search work?
>
> . . . Patients enter text into a search bar indicating, for example, a symptom, visit reason, specialty or doctor's name, along with their location and insurance information. *Each patient's search results are based on what they've told us they need and other patient-centric criteria.* . . .
>
> What factors do you take into account in search rankings?
>
> *We take into account a variety of factors with each search, all centered around the information each patient inputs.* The primary patient-centric factors include: the patient's visit reason, insurance information, and location, as well as the doctor's upcoming appointment availability. . . .

---

[1] The Advisory Opinion explicitly states that the opinion "is limited to the facts presented" and that "[i]f material facts have not ben disclosed or have been misrepresented, this opinion is without force and effect." Advisory Opinion 19-04 at pp. 1-2.

How often do search results and rankings change?

Search results and rankings (the order in which doctors are listed in a particular set of search results) are unique to every patient, *and regularly fluctuate based on the patient-centric criteria described above. . . What stays consistent is our patients first approach – search on Zocdoc will always be centered around the patient and optimized to help a patient independently find what they need and book an appointment.*

, , ,

Do you steer patients to particular doctors? For example, do you have protocols to evenly distribute appointments across all or a subset of doctors?

*No. Our search is always designed to maximize relevance for each patient and to help patients independently make their own healthcare decisions. As described above, the search results consider patient-centric factors, and the patient selects a doctor based on his or her unique preferences. We do not guarantee a doctor will receive a certain number of appointments, and we do not prioritize certain doctors in order to increase their appointment volume* – a doctor's past performance doesn't dictate current or future ranking.

Can doctors pay to appear more prominently in search results?

*No, not for our core marketplace search experience.* Our Sponsored Results are a separate advertising product which allows certain participating doctors to be listed above the marketplace search results in paid listings. . . .

Zocdoc Website, "Frequently Asked Questions," (emphasis added), accessible at

https://www.zocdoc.com/about/how-search-works/.

49.     The truth, as described in more detail below, is that Zocdoc systematically overrides patient search criteria based on unlawful financial considerations by prioritizing in its search results providers who pay more in "booking fees" and filtering out of search results those providers who are unable or unwilling to pay those fees, or who have exceeded their monthly cap

on new patient "booking fees," unless and until they authorize increased spending for such fees, at which time their eligibility to appear in Zocdoc search results is restored.[2]  As earlier noted, moreover, this is true despite the fact that these filtered-out providers are paying Zocdoc an annual "subscription fee" to be listed with Zocdoc and appear in patient search results. Moreover, and perhaps most egregiously, Zocdoc intentionally misrepresents provider appointment availability based on those same considerations. Specifically, for providers who have exceeded their monthly cap on new patient "booking fees," Zocdoc removes their online appointment availability for new patients by falsely advising potential new patients that the provider has no upcoming appointments available, even while simultaneously showing appointment availability to existing patients seeking to book appointments with that same provider.

50.    Further, Zocdoc's material misrepresentations to OIG and the public offer additional evidence of the illegal purpose underlying its per patient "booking fee" to induce and reward patient referrals. As reflected in the below screenshot of an email that Zocdoc sent to Relator soon after the change explaining the new price model, Zocdoc's new pricing charged Relator $35 for each *new patient* booking.  Zocdoc would not charge Relator if an existing patient booked with him through Zocdoc, and also would not charge Relator if a new patient cancelled his or her appointment with Relator less than 24 hours after booking it, during a period when the patient presumably is still making up his or her mind about moving forward.

---

[2] Additionally, Zocdoc leaves out of search results altogether those providers who do not pay Zocdoc's $299 subscription fee and thus do not participate in Zocdoc, irrespective of whether they would otherwise satisfy a patient's search criteria in seeking medical services.

From: "Zocdoc" <Service@Zocdoc.com>
Subject: What to expect with your next bill
Date: February 25, 2020 at 2:39:40 PM EST
To: <s.sisselman@sissmedgroup.com>
Reply-To: "Zocdoc" <reply-feef16737c6d0d-22_HTML-12497386-7291279-3@mail2.zocdoc.com>

. . .

For a quick breakdown of when you will be charged a new patient booking fee,
please reference the table below.

**ZOCDOC PATIENT BOOKING FEES**

| | Each new patient booking from Zocdoc website or app | Each existing patient booking from Zocdoc website or app | Each new or existing patient booking from your website |
|---|---|---|---|
| Patient attends appointment | $35 | $0 | $0 |
| Practice cancels appointment | $35 | $0 | $0 |
| Patient no shows or cancels appointment more than 24 hours after booking | $35 | $0 | $0 |
| Patient cancels appointment less than 24 hours after booking | $0 | $0 | $0 |

## Zocdoc

Privacy | Terms

© Zocdoc, Inc. 568 Broadway, 9th Floor New York, NY, 10012, US

51.     Although these exceptions to the "booking fee" were disclosed to OIG, they would not have been expected to raise special concerns based on Zocdoc's other representations that search results are determined solely by patient-centric criteria and not by the amount paid to Zocdoc by providers, that Zocdoc does not recommend or prioritize paying providers over non-paying providers and that the "booking fee" is supposedly fair market value for the scheduling service offered. However, since Zocdoc does game search results and prioritize paying providers in all the ways detailed above, and the "booking fee" is adjusted based on factors other than fair market value (*e.g.*, medical specialty), these exceptions become just additional proof of illicit intent. Existing patients do not represent new referral benefits to Zocdoc's provider customers.

The exceptions to Zocdoc's "booking fee" plainly account for these realities by not charging a "booking fee" for existing patients and quick cancellations. In setting these terms, Zocdoc has supplied more evidence of its nefarious purpose in holding new patient referrals hostage to a provider's willingness to pay Zocdoc for that privilege, and further exposed its illegal intent under the AKS in charging providers for each such referral.

## B. **Detailed Evidence That Zocdoc's "Booking Fee" Is An Illegal Kickback**

52.     Once Zocdoc moved Relator over to its per patient "booking fee" price model, Relator began paying $35 for each new patient appointment booked through Zocdoc, in addition to paying an annual subscription fee of $299 for what he believed was the right to be listed in Zocdoc search results. Relator's monthly costs with Zocdoc soon skyrocketed.

53.     Whereas previously, Zocdoc charged Relator $3000 annually, irrespective of how many new patient appointments were booked with him through Zocdoc, Relator now is charged, on average, between about $600 and $900 per month for new patient bookings generated through the Zocdoc platform. In 2020 alone, Relator was charged more than $7400 in new patient bookings, more than twice what he was charged previously on a flat-fee basis to use Zocdoc's platform without reference to patient volume. Through August of this year, Relator was charged more than $7200 in new patient bookings, well ahead of last year's pace.

54.     During August 2021, Relator established a monthly spend cap for new patient bookings to limit the monthly "booking fees" that Zocdoc was charging him for new patient referrals. Relator soon learned that this decision adversely impacted the ability of patients to find him in Zocdoc search results and for new patients to book appointments.

55.     Once Relator exceeded his monthly spend cap for new patient "booking fees," Zocdoc dropped his name from search results, notwithstanding that he had separately paid a

$299 subscription fee to be listed on Zocdoc. Regardless of whether a patient's search criteria matched Relator's specialty and location, Relator no longer appeared in the provider search results until he refreshed his monthly cap in the next monthly payment cycle, at which time Relator's name would suddenly appear in the search results once again. After Relator established and then exceeded his monthly spend cap for new patients, Zocdoc expressly warned him of these consequences in an email:

**From:** Zocdoc <service@mail2.zocdoc.com>
**Date:** August 31, 2021 at 10:04:54 AM EDT
**To:** s.sisselman@sissmedgroup.com
**Subject:** [Reminder] Adjust your monthly spend cap if you are accepting new patients
**Reply-To:** Zocdoc <reply-ff031770706400-22_HTML-12497386-7291279-16@mail2.zocdoc.com>



### New patients haven't been able to find you in Zocdoc search for 6 days

Sisselman Medical Group,

As a reminder, you have been inactive in Zocdoc search since 08/25/2021, so you may be missing out on new patient bookings.

Hitting your monthly spend cap means that new patients cannot find you on Zocdoc search until the beginning of September unless you update your spend cap. If you still have openings this month for new patients, consider adjusting your monthly spend cap.

**Adjust your monthly spend cap**

56.    In consideration of Relator's payment of the $299 annual subscription fee, Zocdoc continued to maintain an online profile for Relator that could only be accessed through a drop-down menu if a patient happened to search for Relator by name. However, anyone self-

identifying as a "new" patient who tried to book an appointment with Relator through his online profile was immediately and falsely advised by Zocdoc through an automated pop-up message that Relator had no appointment availability, even though a calendar accurately reflecting appointment availability was displayed for anyone self-identifying as an existing patient of Relator.

57.     On or about August 26, 2021, Relator spoke to a Zocdoc Service Representative in a recorded phone conversation to get clarification of Zocdoc's policy as it related to the handling of provider search results and appointment availability for providers who had exceeded their monthly spend cap for new patient "booking fees." The Service Representative explicitly confirmed to Relator that once he reaches his monthly spend cap, if someone identifying as a new patient pulled up Relator's online profile and attempted to book an appointment, the Zocdoc platform "will just show that you don't have availability, but if they select that they are an existing patient, it will show what availability you have." Further reiterating the point, the Service Representative stated that "if I select new patient, like I've never seen you before, it takes away all your availability, but if I select 'I'm existing,' it shows me all the availability you have." Seeking further confirmation, Relator then stated, "So even though I have availability, if a patient identifies themself as a new patient, they won't see that I have availability, even though there is availability," to which the Service Representative replied "That's right. Yes." The Service Representative further confirmed as accurate Relator's statement that once the monthly cap refreshed, "new patients will see exactly what the existing patients see" but, according to the Service Representative, that would last only "until [Relator] hits his spend cap again and then it will take that availability away for new patients." At the end of the call, the Service Representative offered to escalate the matter to an Account Manager.

58.     In a subsequent recorded phone conversation between Relator and a Zocdoc Account Manager on August 31, 2021, the Account Manager likewise confirmed that new patients "will see [Relator] as unavailable" once he reaches his monthly spend cap and Zocdoc "will not allow them to book with you because it costs money for them to book with you." The Account Manager also acknowledged that patients searching for Relator by specialty and zip code would not find him in the search results once the monthly spend cap is reached, but that he would once again appear in search results when the cap is refreshed the following month. The Account Manager also explained to Relator the background for the "booking fee," expressly conceding that it is a "marketing fee" that is being charged for generating a patient referral:

> The fee that you pay for the new patient booking is a marketing fee. So that marketing fee is the cost of us . . . that patient had no idea who you were, they searched for a new doctor, they found you, they clicked you, they decided to book with you, that booking gets created, you incur the fee of us marketing you towards that patient and you getting that patient booking, so the fee is really the marketing cost here.  So if you don't want to incur the additional marketing cost, then we don't market you towards the new patient because we don't want to have to charge you the marketing cost when you've already set your terms on how much you're comfortable spending.

59.     As evidenced by the excerpted conversations with Zocdoc representatives transcribed above, while Zocdoc went to great lengths to conceal the illicit purpose of its new "booking fee" in public marketing statements and other statements made to government regulators, in its non-public, private messaging to providers, Zocdoc made no secret of the fact that the per patient "booking fee" it was charging for new patients was Zocdoc's price for sending Relator (and other providers) Zocdoc-generated patient referrals.  Indeed, Zocdoc created performance metrics for its provider-customers comparing the costs they were incurring in "booking fees" with the economic value that each new patient represented to the provider in

27

anticipated professional revenues.   The excerpted screenshots below are taken from Relator's

online Zocdoc "Dashboard" and purports to explain the economic advantage to Relator in paying

Zocdoc "booking fees" in terms of projected patient revenues to Relator's practice:





The top screenshot from Relator's Dashboard shows that in August, 2021, Relator spent $1,120 in "booking fees" on 32 new patient bookings as of August 25. The performance summary in the second screenshot shows that by August 26, Relator had received 36 new patient bookings from Zocdoc, each of which according to Zocdoc was worth an average of $375 to Relator in the first year, for a total of $13,500. The message from Zocdoc is clear: "The 'booking fees' you pay us for new patients are but a fraction of the revenue you will realize from the services you can bill for those new patients." The warning in red at the top of the bottom screenshot states that Relator's practice has reached its monthly spend cap and therefore "cannot receive new patients from Zocdoc until [the cap] resets" the following month; the "Search Status" of physicians in Relator's practice, as reflected in the bottom screenshot, reads "Inactive." Zocdoc urged Relator to "[a]djust [his] spend cap to [he] can keep accepting new patients this month."

60.     The evidence summarized above overwhelmingly demonstrates that Zocdoc's per patient "booking fee" is an illegal kickback solicited by Zocdoc from medical providers in return for referring new patients to those providers for appointments, for prioritizing and recommending paying providers over non-paying providers in Zocdoc search results and for preventing competing non-paying providers from booking appointments with new patients searching for medical services.

### C.  Representative False Claims Resulting From Zocdoc's AKS Violations

61.     Each referral of a Federal Health Care Program beneficiary for which Zocdoc unlawfully charged a provider a $35 kickback as a so-called "booking fee" represented a violation of the AKS, and all claims for reimbursement arising from those AKS violations were false claims under the FCA.  Listed below are representative false claims caused by Zocdoc's fraudulent misconduct in soliciting kickbacks in the form of "booking fees" from Relator.  Each claim listed below relates to a Federal Health Care Program beneficiary (anonymized for purposes of this Complaint) referred to Relator by Zocdoc as a new patient for whom Zocdoc charged Relator a $35 "booking fee" as an illegal kickback.  The claims below are intended to be illustrative only.  By Zocdoc's own assessment, millions of patients book medical appointments through its online platform every month.   Medicare and Medicaid alone account for approximately 37% of all healthcare spending in the United States. *See* Centers for Medicare & Medicaid Services, National Health Expenditures 2019 Highlights, accessible at National Health Expenditures 2019 Highlights (cms.gov). Accordingly, on information and belief, the losses inflicted on Federal Health Care Programs through Zocdoc's systematic violation of the AKS and FCA are substantial, in an amount to be determined at trial.

**Representative False Claims**

|  | Insurance | Date of Service | Services | Total Claim Amount |
|---|---|---|---|---|
|  |  |  |  |  |
| Patient A | Medicare | 3/13/20 | Office Visit | $195 |
| Patient B | Medicare | 12/2/20 | Office and Wellness Visit, Cancer/Depression/Cardiovascular Disease Screening, Urinalysis, Venipuncture, EKG | $635 |
| Patient C | United Healthcare Community Plan (Medicaid) | 1/2/21 | Initial preventive medicine services, mental health screening, EKG | $460 |
| Patient D | United Healthcare Community Plan (Medicaid) | 5/17/21 | Initial preventive medicine services, mental health screening, EKG, Urinalysis, Venipuncture | $495 |
| Patient E | Blue Cross Blue Shield Federal Employee Program | 7/7/21 | Initial preventive medicine services, mental health screening, EKG, Urinalysis, Venipuncture, Evoked otoacoustic emissions | $590 |
| Patient F | Blue Cross Blue Shield Federal Employee Program | 8/9/21 | Office visit, Urinalysis, Venipuncture | $310 |

## VI.   CAUSES OF ACTION

### COUNT ONE
### (Federal False Claims Act)
### 31 U.S.C. § 3729(a)(1)(A)

62.     Relator repeats and realleges each and every allegation contained in paragraphs 1 through 61 above as though fully set forth herein.

63.     This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729, et seq., as amended.

64.     By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to officers, employees or agents of the United States government for payment or approval. 31 U.S.C. § 3729(a)(1)(A).

65.     The United States, unaware of the falsity of the claims made or caused to be made by the Defendant, paid and continues to pay the claims that would not be paid but for Defendant' unlawful conduct.

66.     By reason of the Defendant' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

67.     Additionally, the United States is entitled to the maximum penalty of $11,000 (and up to $23,331 per claim for claims made after November 2, 2015) for each and every false and fraudulent claim made and caused to be made by Defendant arising from their unlawful conduct as described herein.

### COUNT TWO
### (Federal False Claims Act)
### 31 U.S.C. § 3729(a)(1)(B)

68.   Relator repeats and realleges each and every allegation contained in paragraphs 1 through 61 above as though fully set forth herein.

69.   This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729, *et seq.*, as amended.

70.   By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false or fraudulent records and statements, and omitted facts, that were material to false or fraudulent claims, within the meaning of 31 U.S.C. § 3729(a)(1)(B).

71.   The United States, unaware of the falsity of the records, statements and material omissions made or caused to be made by the Defendant, paid and continues to pay the claims that would not be paid but for Defendant' unlawful conduct.

72.   By reason of the Defendant' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

73.   Additionally, the United States is entitled to the maximum penalty of $11,000 (and up to $23,331 per claim for claims made after November 2, 2015) for each and every false and fraudulent claim made and caused to be made by Defendant arising from their unlawful conduct as described herein.

## COUNT THREE
### (Federal False Claims Act)
### 31 U.S.C. § 3729(a)(1)(G)

74.   Relator repeats and realleges each and every allegation contained in paragraphs 1 through 61 above as though fully set forth herein.

75.   This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729, *et seq.*, as amended.

76.   By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealed or knowingly and improperly avoided or

decreased an obligation to pay or transmit money or property to the Government, within the meaning of 31 U.S.C. § 3729(a)(1)(G).

77.   The United States, unaware of the falsity of the records and statements and of the Defendant's concealment and unlawful conduct, was denied an opportunity to claim and demand return of the money and property to which it was legally entitled.

78.   By reason of the Defendant' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

79.   Additionally, the United States is entitled to the maximum penalty of $11,000 (and up to $23,331 per claim for claims made after November 2, 2015) for each and every false and fraudulent claim made and caused to be made by Defendant arising from their unlawful conduct as described herein.

## **PRAYER FOR RELIEF**

WHEREFORE, Relator, acting on behalf and in the name of the United States of America, demands and prays that judgment be entered against Defendant under the Federal False Claims Act as follows:

(1)     That Defendant cease and desist from violating 31 U.S.C. §§ 3729 *et seq.* as set forth above;

(2)     That this Court enter judgment against Defendant in an amount equal to three times the amount of damages the United States has sustained because of Defendant' actions, plus a civil penalty of not less than $11,665 and not more than $23,331 for each violation of 31 U.S.C. § 3729;

(3)     That Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d);

(4)     That Relator be awarded all costs of this action, including attorneys' fees and expenses; and

(5)     That Relator recover such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demands a

trial by jury.

Dated: January 24, 2022

KAISER SAURBORN & MAIR P.C.

By: _____
    Daniel J. Kaiser
    William H. Kaiser
    30 Broad Street, 37th Floor
    New York, New York 10004
    Telephone No. (212) 338-9100
    Facsimile No. (212) 338-9088
    kaiser@ksmlaw.com
    kaiserw@ksmlaw.com


KAISER LAW FIRM, PLLC

By: _____
    Geoffrey R. Kaiser
    926 RXR Plaza
    Uniondale, New York 11556-0926
    Telephone No. (516) 570-3071
    Facsimile No. (516) 570-3071
    gkaiser@kaiserfirm.com

*Attorneys for Plaintiff-Relator*
*Stephen Sisselman, D.O.*