UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
UNITED STATES OF AMERICA ex rel.
STEPHEN SISSELMAN, D.O.,

                          Plaintiff,                    22-cv-861 (PKC)

          -against-                            OPINION AND ORDER

ZOCDOC, INC.,

                          Defendant.
------------------------------------------------------------x

CASTEL, U.S.D.J.

          Defendant Zocdoc, Inc. ("Zocdoc") operates an online platform through which

prospective patients can search for medical providers based on specialty and geography, among

other factors, and schedule an appointment with the chosen provider.  Patients pay nothing to use

the Zocdoc platform, but Zocdoc charges medical providers both an annual fee to be listed in the

platform's database and a separate fee for each new patient who books an appointment through

Zocdoc.  If the provider has opted not to pay the new-patient fee or has reached a self-set

monthly spending cap, the provider's Zocdoc search rankings are affected and it cannot accept

new-patient appointments through the Zocdoc platform.

          Relator Stephen Sisselman, D.O., brings qui tam claims on behalf of the United

States pursuant to the False Claims Act, 31 U.S.C. § 3729 (the "FCA").  Sisselman asserts that

Zocdoc's new-patient fees are unlawful referral fees that favor medical providers who pay fees

over those that do not, and thus violates the Federal Anti-Kickback Statute, 42 U.S.C. § 1320a-

7b(b) (the "AKS").  Zocdoc twice applied to the Office of the Inspector General, Department of

Health and Human Services (the "OIG") for Advisory Opinions as to whether its fees violate the

AKS.  Each Advisory Opinion concluded that the new-patient fee presented "a low risk of fraud"

and stated that the OIG would not take regulatory action if Zocdoc relied in good faith on the conclusions set forth in that Advisory Opinion. The United States has declined to intervene in this action. (See ECF 14.)

Sisselman is a physician who has been enrolled as a provider on Zocdoc since 2014. Sisselman does not purport to be a Zocdoc insider or have internal information about Zocdoc's implementation of fees. However, citing to "nonpublic evidence" in the form of his emails and recorded phone conversations with Zocdoc accounts managers, screenshots of a Zocdoc provider "dashboard," and invoice and medical-claim documentation, Sisselman asserts that Zocdoc misrepresented to the OIG the factors that went into calculating new-patient fees and their effects on patient search results in order to conceal that the fees function as unlawful kickbacks paid in exchange for new-patient referrals.

Zocdoc moves to dismiss the Second Amended Complaint (the "Complaint") pursuant to Rules 12(b)(6) and 9(b), Fed. R. Civ. P. The OIG's two Advisory Opinions expressly addressed the two central concerns raised by Sisselman: the variation in new-patient fees based on a provider's medical specialty and the fees' role in Zocdoc's search results. Based on the Complaint's own allegations, Zocdoc sought and received approval from the OIG before implementing new-patient fees for providers who serve beneficiaries of federal healthcare programs. The "nonpublic evidence" cited by Sisselman mainly consists of isolated phrases in what were essentially sales and marketing communications that he received as a Zocdoc customer. The Complaint does not plausibly allege that Zocdoc misled the OIG, has acted in a manner inconsistent with the two Advisory Opinions, or has acted with the necessary mens rea required to state a claim under the FCA and AKS.

Zocdoc's motion to dismiss will therefore be granted, and judgment will be entered for Zocdoc.

BACKGROUND.

A. Overview of Zocdoc's Fees.

Zocdoc maintains an online platform that lets patients make appointments with medical providers.  (Compl't ¶ 3.)  A patient may search for appointments by doctor name, zip code and specialty, and then book an appointment with a chosen provider through the Zocdoc platform.  (Compl't ¶ 3.)

Patients pay nothing to use Zocdoc but providers pay two kinds of fees.  (Compl't ¶ 4.)  First, providers pay an annual subscription fee of $299 in order to be included in the Zocdoc database.  (Compl't ¶ 4.)  Separately, they pay a fee each time that a patient who is new to that particular provider books an appointment through Zocdoc.  (Compl't ¶ 4.)  The size of the new-patient fee varies depending on the provider's area of specialization, from as low as $35 to as high as $110, and providers may set monthly caps as to their total new-patient fees.  (Compl't ¶ 4.)  Once the provider's monthly cap is reached, Zocdoc "filter[s] out" search results for that provider, until the provider increases the monthly cap or a new month begins.  (Compl't ¶ 6.)

Zocdoc adopted the new-patient fee in or around 2018.  (Compl't ¶ 43.)  Previously, to be included in the Zocdoc database, providers paid either an annual flat rate of $3,000 or a monthly flat rate of $300.  (Compl't ¶ 41.)  Under that system, all providers paid the same amounts, regardless of how many new-patient appointments they received through Zocdoc.  (Compl't ¶ 41.)  Zocdoc publicly explained that the transition to the new-patient fee was intended both to lower the barrier of participation in Zocdoc and to make the fee system fairer to all providers regardless of how many patients they received through Zocdoc.  (Compl't ¶ 43.)

Zocdoc first applied its new-patient fee only when appointments were booked by customers who used commercial insurance.  (Compl't ¶ 44.)  Before charging the fee for appointments made by federal health care program beneficiaries, it requested an Advisory Opinion from the OIG as to whether it could lawfully extend the new-patient fee to beneficiaries of Medicare parts A and B, Medicaid and TRICARE, the last of which is the federal health care program offered to military service members through civilian providers.  (Compl't ¶¶ 25-29, 44.)  As will be discussed, Congress has authorized the OIG to issue Advisory Opinions so that HHS may clarify and cabin the potentially sweeping reach of the AKS, and Advisory Opinions are binding upon HHS and the requesting party.

Sisselman describes himself as a primary-care provider licensed to practice medicine in New York.  (Compl't ¶¶ 10, 41.)  He has been enrolled as a Zocdoc provider since 2014.  (Compl't ¶ 10.)  Sisselman does not purport to have been a company insider and draws his allegations about Zocdoc's purported scheme from emails, recorded phone calls, and automated information generated by Zocdoc.  (Compl't ¶¶ 63-84.)  Sisselman describes himself as "the original source" for this "wealth of nonpublic evidence . . . ."  (Compl't ¶¶ 12, 60.)

The gist of Sisselman's claims is that Zocdoc's new-patient fee is actually a "referral fee" or "success fee" that refers or steers the beneficiaries of federal health-care programs to medical providers that pay new-patient fees to Zocdoc.  (Compl't ¶ 6.)  He asserts that Zocdoc "manipulat[es]" search results to prioritize providers who pay the new-patient fee, as opposed to those who do not pay the fee or have already reached their monthly cap.  (Compl't ¶ 6.)  Sisselman calls this an "unlawful kickback arrangement" that rewards and prioritizes doctors who pay the new-patient fee, describing it as an "illicit sale of patient referrals" that is unlawful under the AKS, and, by extension, the FCA.  (Compl't ¶¶ 8-9.)

The Complaint also asserts that Zocdoc misrepresented its new-patient fee to the OIG as reflecting the fair market value for its services, claiming that the fee was determined by an independent valuation firm.  (Compl't ¶ 47.)  In reality, the Complaint asserts, the fee was calculated based on the value of the provider's medical specialty.  (Compl't ¶ 47.)  For example, the Complaint asserts that Zocdoc charges higher fees to practices that specialize in neurology or orthopedics than it does to primary-care physicians.  (Compl't ¶ 48.)  According to the Complaint, basing the fee calculation on a provider's willingness to pay or the relative value of the patient referral is contrary to setting a fee based on fair market value.  (Compl't ¶ 48.)  The Complaint asserts that Zocdoc "withheld" this information from the OIG in its applications for Advisory Opinions.  (Compl't ¶ 49.)

The Complaint also asserts that Zocdoc implemented a "secret caste system" that separates providers into two tiers.  (Compl't ¶ 50.)  Providers who paid Zocdoc's new-patient booking fees were more visible in search results to prospective patients than those who paid only the annual $299 subscription.  (Compl't ¶ 50.)  Those who paid the annual subscription fee were searchable only by name, whereas those who paid the new-patient fee showed up in broader search results.  (Compl't ¶ 50.)  The Complaint calls this a "sleight of hand" that was not disclosed to the OIG.  (Compl't ¶ 50.)  It quotes from Zocdoc's representations to the OIG claiming that "[t]he algorithm does not filter or prioritize providers . . . based on the amount Providers pay" and that Providers' listings "depend only on user-centric data" without reference to fees paid by the providers.  (Compl't ¶ 51.)  The Complaint asserts that these "deceptions" are evidence that Zocdoc knowingly and willfully violated the AKS and FCA.  (Compl't ¶ 53.)

B.  <u>The Two Advisory Opinions Issued by the OIG.</u>

Upon Zocdoc's application, the OIG issued two separate Advisory Opinions that discussed in detail the role of the new-patient fee and how payment of the fee affects patient search results on the Zocdoc platform.

The OIG issued Advisory Opinion No. 19-04 on September 5, 2019 ("AO 19-04"), which set forth its analysis in twelve single-spaced pages.  (ECF 32-1.)  Sisselman states that after AO-19 was issued, he "brought a wealth of nonpublic evidence to the attention of the Department of Justice (DOJ)," and the DOJ, in turn, relayed that information to the OIG. (Compl't ¶¶ 60, 62.)  Zocdoc then applied to the OIG for a second Advisory Opinion, and the OIG issued Advisory Opinion 23-04 on July 6, 2023 ("AO 23-04"), which set forth its analysis in fourteen single-spaced pages.  (Compl't ¶ 62 & ECF 32-3.)  As will be discussed, both Advisory Opinions reflect a thorough understanding by the OIG of the variance in new-patient fees and how a provider's payment of those fees affected their placement in patient search results.

AO 19-04 recognized that "the fee per new-patient appointment booking varies . . . by Providers' medical specialty, geographic location, and in certain circumstances, other relevant factors that affect fair market value . . . ."  (AO 19-04 at 4; <u>see also</u> <u>id.</u> at 8 (describing fee in similar language).)  It also noted that the size of the individual fee did not affect search rankings:  "[W]hile more clicks or new-patient bookings, as applicable, would result in Providers paying higher fees to [Zocdoc], higher fee payments would not result in more frequent appearances, or favorable placements, in Marketplace Results."  (AO 19-04 at 8.)  It concluded that Zocdoc's new-patient fee "implicates" the AKS because Zocdoc would be arranging for the furnishing of federally reimbursable services in exchange for the payment of

fees. (AO 19-04 at 8.) However, it concluded that the fees "would present a low risk of fraud and abuse under the [AKS]" based on a combination of six reasons. (AO 19-04 at 8-10.) In giving these reasons, the OIG specifically noted that new-patient fees varied by medical specialty and other circumstances, but that the fees paid to providers were not based on "the volume or value of Federal health care program business generated by the Marketplace," and that payment of higher fees would not result in more favorable search placements. (AO 19-04 at 8.) It concluded that "although the Proposed Arrangement could potentially generate prohibited remuneration under the anti-kickback statute if the requisite intent to induce or reward referrals of Federal health care program business were present, the OIG would not impose administrative sanctions on Zocdoc . . . in connection with the Proposed Arrangement." (AO 19-04 at 10.)

AO 23-04 similarly discussed the calculation of new-patient fees, but also considered in greater detail the relationship between those fees, a provider's spend cap, and how Zocdoc ranked providers in patient search results. It referenced AO 19-04 at the outset and noted that "[s]ince issuing that opinion, OIG became aware that some aspects of the Existing Arrangement may have differed from those described in AO 19-04."[1] (AO 23-04 at 1 n.1.) Like AO 19-04, it noted that the new-patient fee was calculated based on a number of factors, including the provider's medical specialty, specifically identifying it as one consideration that affects fair market value. (AO 23-04 at 3-4, 4 n.6, 10.) In addition, AO 23-04 included a two-and-a-half page, single-spaced description of how a provider's use of a monthly spending cap on new-patient fees affects the provider placement in patient search results. (AO 23-04 at 5-7.) Like AO 19-04, AO 23-04 concluded that the new-patient fee "implicates" the AKS because

---

[1] It then noted: "To the extent Requestor has been operating the arrangement described in AO 19-04 inconsistent with any material certifications made to OIG in relation to that opinion, AO 19-04 would be inapplicable to such arrangement." (AO 23-04 at 1 n.1.) The OIG did not exercise its authority to rescind, terminate or modify AO 19-04. See 42 C.F.R. § 1008.45.

providers pay Zocdoc to recommend them to prospective patients, including federal health care program beneficiaries.  (AO 23-04 at 9-10.)  It also observed that Zocdoc provides a form of "remuneration" to patients by making the Zocdoc platform free for use in a way that may induce them to buy services from providers, noting that those services are federally reimbursable.  (AO 23-04 at 10.)  But it proceeded to emphasize that the new-patient fees are not determined to account for the value of federal health program business and that the size of the fee does not affect a provider's placement in search results.  (AO 23-04 at 10.)  It noted that any member of the general public could access Zocdoc and generate search results, regardless of insurance status.  (AO 23-04 at 11-12.)  It also described "transparency safeguards" that Zocdoc would implement for federal healthcare program beneficiaries, including as to appointment availability, and would not filter out providers who had reached their monthly spend cap.[2]  (AO 23-04 at 12.)

As with the AO 19-04, AO 23-04 concluded that "the risk of fraud and abuse . . . is sufficiently low under the [AKS] for OIG to issue a favorable advisory opinion."  (AO 23-04 at 10.)  It stated that "although the Arrangement would generate prohibited remuneration under the [AKS] if the requisite intent were present, OIG will not . . . impose administrative sanctions on [Zocdoc] as those sections relate to the commission of acts described in the [AKS]."  (AO 23-04 at 13.)  It stated: "OIG will not proceed against [Zocdoc] with respect to any action that is part of the Arrangement taken in good-faith reliance upon this advisory opinion, as long as all of the material facts have been fully, completely, and accurately presented, and the Arrangement in practice comports with the information provided."  (AO 23-04 at 14.)

---

[2] Sisselman asserts that these changes were adopted in light of the information he submitted to the DOJ and the OIG. (Compl't ¶¶ 62.)

C.  <u>Sisselman's Claimed Non-Public Evidence about Zocdoc's New-Patient Fees.</u>

Sisselman asserts that the "nonpublic evidence" he shared with the DOJ and cites in his Complaint shows that Zocdoc's new-patient fees were "referral fees" that function as kickbacks "based on reimbursement value in exchange for referring patients who could be billed to Federal Health Care Programs and other payers."  (Compl't ¶ 60.)  He asserts that this specifically includes evidence showing that Zocdoc's new-patient fee did not reflect a fair market value for its booking and marketing services "but was instead the price charged for receiving referrals from Zocdoc."  (Compl't ¶ 61.)  He also states that his evidence demonstrated that Zocdoc's platform automatically "drop[ped]" patients from search results for providers who stopped paying the new-patient fee.  (Compl't ¶ 61.)

Sisselman states that in December 2016, he exchanged emails with a Zocdoc account manager who described Zocdoc as "a referral service" that "need[s] to steer away from charging by volume to avoid Anti-Kickback Statute."  (Compl't ¶ 64.)  After Zocdoc adopted the new-patient fee, Sisselman received an email showing that new-patient bookings made through Zocdoc would require a $35 fee, but that no fee would be imposed for existing patients who booked through Zocdoc.  (Compl't ¶ 66.)  Sisselman asserts that because fees are charged solely for patients who are new to a given provider, Zocdoc is charging providers solely for business opportunities in what amounts to a kickback.  (Compl't ¶ 68.)  Sisselman states that after Zocdoc implemented its new fees, his annual payments to Zocdoc increased from $3,000 to $7,400. (Compl't ¶ 69.)

In August 2021, Sisselman set a monthly spend cap for his own new-patient bookings.  (Compl't ¶ 70.)  Once that cap was reached, Zocdoc "dropped" him from search results.  (Compl't ¶ 71.)  On August 31, 2021, he received an automated email from Zocdoc

stating in part that "[h]itting your monthly spend cap means that new patients cannot find you on Zocdoc search until the beginning of September unless you update your spend cap." (Compl't ¶ 71.) He states that his Zocdoc profile appeared only to patients who searched him by name, and that new patients were shown an automated pop-up message falsely stating that he had no appointment availability. (Compl't ¶ 72.)

        Sisselman recorded an August 2021 phone conversation with a Zocdoc employee who had the job title "service representative." (Compl't ¶ 73.) That individual confirmed that new patients would not be able to book an appointment with Sisselman through Zocdoc if his spend cap had been reached and would be told that he has no appointment availability, but that existing patients would be informed that appointments were available. (Compl't ¶ 73.) In a later phone call, an employee with the job title "account manager" told Sisselman that new patients would not be able to book an appointment once the spend cap was reached "because it costs money for them to book with you." (Compl't ¶ 74.) The account manager repeatedly called the new-patient fee a "marketing fee," explaining that "the fee is really the marketing cost here." (Compl't ¶ 74.) A January 2023 email from a different account manager similarly stated that the new-patient fee was a "marketing fee that allows you to acquire a new patient that has never been seen by you before," and in a February phone call, this same individual stated that Zocdoc did not charge fees where its marketing efforts did not "get the patient through the door for you." (Compl't ¶¶ 75-76.) This person told Sisselman that the new-patient fee was equal to approximately 10% of the annual value that the new patient had for the provider. (Compl't ¶ 77.) Sisselman states that he received follow-up communications from that account manager asking whether he would like to pay fees for new-patient bookings. (Compl't ¶¶ 79-81.)

Sisselman states that these communications show that Zocdoc "went to great lengths to conceal the illicit purpose" of its new-patient fees in its submissions to the OIG. (Compl't ¶ 82.)  The Complaint includes a screenshot of Sisselman's "Dashboard" on Zocdoc, which reflects payments of $1,120 for new-patient fees and an estimated "new patient value" of $13,500.  (Compl't ¶ 82.)  Sisselman asserts that the screenshot communicates a "clear" message that the payment of new-patient fees represented a fraction of the revenue that he could earn from those patients' billings.  (Compl't ¶ 83.)

Sisselman states that this "detailed evidence . . . overwhelmingly demonstrates" that Zocdoc's new-patient fee does not charge fair market value for Zocdoc's scheduling services, but is instead an illegal kickback solicited from medical providers in exchange for referrals of new patients.  (Compl't ¶ 84.)

D.  Overview of the Claims.

The Complaint asserts that a violation of the AKS has occurred every time the beneficiary of a federal healthcare program made an appointment with a provider that paid Zocdoc's new-patient booking fee.  (Compl't ¶ 93.)  It asserts that, in turn, every claim for federal reimbursement arising from those bookings was a false claim under the FCA.  (Compl't ¶ 93.)  It asserts that all such reimbursement claims arose from Zocdoc's solicitation of "kickbacks from providers" to receive new-patient referrals in violation of the AKS.  (Compl't ¶ 94.)

Count One asserts that Zocdoc violated the FCA when it knowingly presented or caused to be presented false or fraudulent claims to the United States in violation of 31 U.S.C. § 3792(a)(1)(A).  (Compl't ¶¶ 96-101.)  Count Two asserts that Zocdoc violated the FCA because it caused the use of fraudulent records, statements and omissions that were material to false or fraudulent claims made to the United States in violation of 31 U.S.C. § 3729(a)(1)(B).  (Compl't

¶¶ 102-07.)  The Complaint asserts that the United States should receive a penalty of $27,018 for each false claim.  (Compl't ¶¶ 101-07.)

In his opposition memo, Sisselman states that he is "no longer pursuing" the claim set forth in Count Three, which asserted a so-called "reverse false claim" theory.  (Opp. Mem. at 25 n.25.)  The Court deems Count Three to be voluntarily dismissed.

MOTION TO DISMISS STANDARD.

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  A court assessing the sufficiency of a complaint must disregard legal labels or conclusions, which are not entitled to the presumption of the truth.  Iqbal, 556 U.S. at 678. Instead, the court must examine only the well-pleaded factual allegations, if any, "and then determine whether they plausibly give rise to an entitlement to relief."  Id. at 679.  "Dismissal is appropriate when 'it is clear from the face of the complaint, and matters of which the court may take judicial notice, that the plaintiff's claims are barred as a matter of law.'"  Parkcentral Global Hub Ltd. v. Porsche Auto. Holdings SE, 763 F.3d 198, 208-09 (2d Cir. 2014) (quoting Conopco, Inc. v. Roll Int'l, 231 F.3d 82, 86 (2d Cir. 2000)).

Much of Zocdoc's motion relies on the text of AO 19-04 and AO 23-04, which the Complaint discusses in detail but does not annex as an exhibit.  On a Rule 12(b)(6) motion, a court may consider documents "incorporated by reference in the complaint."  Revitalizing Auto Communities Env't Response Tr. v. Nat'l Grid USA, 92 F.4th 415, 436 (2d Cir. 2024).  The two Advisory Opinions are properly considered on this motion to dismiss.

"'<u>Qui tam</u> complaints filed under the FCA, because they are claims of fraud, are subject to Rule 9(b).'"  <u>Miller v. United States ex rel. Miller</u>, 110 F.4th 533, 543 (2d Cir. 2024) (quoting <u>United States ex rel. Chorches for Bankruptcy Estate of Fabula v. Am. Med. Response, Inc.</u>, 865 F.3d 71, 81 (2d Cir. 2017)).  "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  Rule 9(b).  "To satisfy Rule 9(b), a complaint alleging fraud 'ordinarily' must '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'"  <u>Miller</u>, 110 F.4th at 543-44 (quoting <u>Chorches</u>, 865 F.3d at 81).  "Rule 9(b) serves several purposes.  '[I]t is designed to provide a defendant with fair notice of a plaintiff's claim, to safeguard a defendant's reputation from improvident charges of wrongdoing, and to protect a defendant against the institution of a strike suit.'"  <u>Id.</u> (quoting <u>O'Brien v. Nat'l Prop. Analysts Partners</u>, 936 F.2d 674, 676 (2d Cir. 1991)).

DISCUSSION.

I.     <u>Overview of the FCA and the AKS.</u>

"[T]he FCA imposes liability on any person who 'knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval' or who 'knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim.'"  <u>Chorches</u>, 865 F.3d at 81 (quoting 31 U.S.C. § 3729(a)(1)(A), (B).  "The FCA defines a 'claim' as 'any request or demand . . . for money or property' that is presented, directly or indirectly, to the United States."  <u>Id.</u> (quoting 31 U.S.C. § 3729(b)(2)(A)).  "[F]raud under the FCA has two components: the defendant must submit or cause the submission of a claim for payment to the government, and the claim for payment must itself be false or fraudulent."  <u>Id.</u> at 83 (quotation marks omitted).

The AKS states:

> Whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person . . . to purchase . . . any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program, shall be guilty of a felony . . . .

42 U.S.C. § 1320a-7b(b)(2)(B). "In 2010, Congress added a provision to the AKS that states: '[A] claim that includes items or services resulting from a violation of [the AKS] constitutes a false or fraudulent claim for the purposes of [the FCA].'" Pfizer, Inc v. United States Dep't of Health & Hum. Servs., 42 F.4th 67, 78 (2d Cir. 2022) (brackets in original; quoting 42 U.S.C. § 1320a-7b(g)). "This provision allows the government to recover losses from claims submitted in violation of the AKS, using the procedural mechanisms established by the FCA." Id.

"At least in part because the sanctions under the AKS are severe, Congress created a process by which parties may seek advisory opinions from HHS OIG as to whether a proposed course of action would violate the AKS." Pfizer, 42 F.4th at 72 (citing 42 U.S.C. § 1320a-7d(b)). "Advisory opinions are binding on both the government and the requesting parties, unless set aside by a reviewing court." Id.; see also 42 U.S.C. § 1320a-7d(b)(4)(A) ("Each advisory opinion issued by the Secretary shall be binding as to the Secretary and the party or parties requesting the opinion."). The OIG is permitted to ask questions or seek additional information in connection with a request for an Advisory Opinion. 42 C.F.R. § 1008.39.

II.    The Complaint Does Not Identify Misrepresentations to the OIG
        or Conduct that Is Inconsistent with the Advisory Opinions.

A.    The Advisory Opinions Expressly Recognized that Provider Specializations
        Are Weighed in Calculating Fair-Market Value for the New-Patient Fee.

Sisselman's claims are premised on the assertion that Zocdoc misled the OIG about important aspects of the new-patient fee and then implemented the fee in a manner that

was inconsistent with the two Advisory Opinions.  His claims are directed to two separate

aspects of the new-patient fee: whether the specialty-based variation in the amounts charged to

providers was inconsistent with the description of the fee as based on "fair market value," and,

separately, whether and to what extent a provider's placement of a monthly spend cap had the

effect of limiting the provider's appearance in new-patient search results.  On both points, the

Complaint does not plausibly identify any misrepresentations or practices at odds with the two

Advisory Opinions.

        The Complaint places great significance on the issue of whether the new-patient

fee reflects a fair market value for Zocdoc's services, as opposed to operating as an unfair

kickback that charges differing rates depending on the provider's specialty and the patient's

expected revenue to that provider.  (See, e.g., Compl't ¶¶ 7, 47-49, 55, 61, 84, 90, 91.)  In

Sisselman's telling, Zocdoc essentially hoodwinked the OIG into wrongly describing the new-

patient fee as a reflection of fair market value, and alleges as follows:

> As it had done in seeking [AO 19-04], Zocdoc misrepresented to
> OIG that its "booking fee" was a [fair-market value] charge for its
> "scheduling service" rather than acknowledging to OIG what it
> really was – i.e., an illegal referral fee and kickback being charged
> for each patient referral, which was being calculated based on the
> estimated annual reimbursement value of the referral to the
> provider's medical specialty.

(Compl't ¶ 90.)

        Both Advisory Opinions noted that the OIG is precluded by statute "from opining

on whether fair market value shall be or was paid for . . . services . . . ."  (AO 23-04 at 4 n.7; AO

19-04 at 4 n. 6.)  See 42 U.S.C. § 1320a-7d(b)(2)(A) ("advisory opinions shall not address . . .

[w]hether the fair market value shall be, or was paid or received for any . . . services . . . .").  But

even a superficial reading of AO 19-04 and AO 23-04 demonstrates that the OIG was aware that

the new-patient fee varied depending on the provider's specialty.  AO 23-04, which was issued

after review of Sisselman's submissions, stated that Zocdoc's new-patient fees "vary by medical

specialty, geographic location, and in certain circumstances, other relevant factors affecting fair

market value . . . ."  (AO 23-04 at 10; emphasis added; see also id. at 3-4 (passage using near-

identical language).)  AO 23-04 then noted that the fees were "agnostic" to users' insurance

status and did not take into account the value of the federal health care program business

generated by Zocdoc.  (Id. at 4.)

        AO 19-04 similarly recognized that new-patient fees varied based on a variety of

factors, including provider specialization.  (AO 19-04 at 4 ("the fee per new-patient appointment

booking varies . . . by Providers' medical specialty, geographic location, and in certain

circumstances, other relevant factors that affect fair market value . . . ."), 8 ("while the fee per

new-patient appointment booking varies . . . by medical specialty, geographic location, and in

certain circumstances, other relevant factors affecting fair market value, [Zocdoc] sets the per-

booking fee amounts . . . in advance, and none of the aggregate fees for Providers to be listed in

Marketplace Results would exceed fair market value.") (emphasis added).)

        Contrary to Sisselman's assertions, the OIG had a full understanding that the per-

patient fees were not a uniform flat fee that was charged equally to all providers, and instead

varied according to the provider's specialty and "other relevant factors."  It is implicit within this

understanding that the amount of the new-patient fee accounted for the particularities of

providers' practices.  Indeed, while AO 19-04 approved Zocdoc's use of new-patient fees, it also

concluded that Zocdoc did not fall within an AKS safe-harbor provision applicable to a referral

service, 42 C.F.R. § 1001.952(f), precisely because its fees were not "assessed uniformly against

all participants and based only on the cost of operating the referral service. . . .  [T]he payments

[Zocdoc] charges would not be based only on the cost of operating the referral service."  (AO 19-04 at 6-7.)

As discussed, both Advisory Opinions concluded that the new-patient fees presented a low risk of fraud and abuse under the AKS.  (AO 19-04 at 8-10; AO 23-04 at 10.) They declined to issue any administrative sanction against Zocdoc and the AO 23-04 stated that the "OIG will not proceed against [Zocdoc] with respect to any action . . . taken in good-faith reliance upon this advisory opinion . . . ."  (AO 19-04 at 10; AO 23-04 at 14.)

The "nonpublic evidence" cited in the Complaint does not plausibly describe how Zocdoc misled the OIG or acted in a manner contrary to the Advisory Opinions.  That a Zocdoc employee colloquially referred to the business as a "referral service," another employee used the term "marketing fee," and a Zocdoc mass email to providers used the term "booking fee" does not plausibly allege that Zocdoc misled the OIG or implemented its fees in a manner inconsistent with either Advisory Opinion.  (Compl't ¶ 64, 66, 74)

Paragraph 77 of the Complaint consists of partial and edited quotations from a phone call between Sisselman and a Zocdoc account manager.  It quotes the account manager as saying that Zocdoc set new-patient fees with the expectation "that you'll get a large return on your investment" based on patient visits over the next 12 months.  (Compl't ¶ 77.)  This and other remarks were uttered in a customer-service call between Sisselman as an existing Zocdoc client and an account manager trying to secure his business.  Whether considering the previous, across-the-board flat fee historically used by Zocdoc or the new-patient fee considered in the Advisory Opinions, a provider would likely engage Zocdoc and pay its fees only if it expected to receive some economic value.  That expectation is consistent with the Advisory Opinions, their description of the new-patient fees and the use of the term "fair market value."

To the extent that the Complaint also includes screenshots of Sisselman's "dashboard" as a Zocdoc provider, it merely reflects that he spent $1,120 in new-patient fees for 32 new patients, and that Zocdoc estimated he would receive an aggregate of $13,500 in revenue from these new patients. (Compl't ¶¶ 82-83.) This screenshot does not reflect an inconsistency between the OIG's understanding of the new-patient fees or a material deviation from the implementation of fees as described in the Advisory Opinions.

The Complaint does not include facts that plausibly allege misleading statements from Zocdoc to the OIG. It also does not plausibly allege that Zocdoc has calculated new-patient fees in a manner materially inconsistent with the reasoning of the two Advisory Opinions. To the extent that its two FCA claims are premised on Zocdoc's calculation of new-patient fees, the claims will be dismissed.

B. AO 23-04 Reveals Careful Consideration the Effect of Fee Caps on Search Rankings and the Complaint Does Not Identify Misrepresentations to the OIG or a Material Deviation from the Opinion.

The Complaint also asserts that the new-patient fees function as kickbacks because providers who either do not pay them or who reached their monthly spend cap were hidden in Zocdoc's search results. (Compl't ¶ 50.) As characterized in the Complaint, this shows that Zocdoc used "unlawful financial considerations" by prioritizing providers that paid new-patient fees and punished those that were unable or unwilling to do so. (Compl't ¶¶ 56-57.) The Complaint also asserts that Zocdoc misled prospective patients into thinking that a fee-capped provider had no available appointments, when, in truth, appointments could still be booked directly through the provider. (Compl't ¶¶ 61, 62.)

As noted, AO 19-04 did not address the issue of spend caps or their effect on provider search rankings. Sisselman states that the OIG issued AO 23-04 "[i]n direct response to

Relator's evidence of non-compliance . . . ." (Compl't ¶ 62.) AO 23-04 accordingly described the relationship between spend caps and provider search rankings: It stated that Zocdoc "removes Providers from Marketplace Results through the end of the applicable month when Providers reach spending caps. A User who identifies as a potential new patient of a spend-capped Provider cannot book an appointment with such Provider on the Marketplace for the remaining time the Provider is spend-capped (i.e., the remainder of the month)." (AO 23-04 at 5.) This is the precise practice that the Complaint urges amounts to an unlawful kickback that rewards providers willing to pay new-patient fees and punishes those that do not. (See, e.g., Compl't ¶¶ 61, 68, 70-71.)

AO 23-04 then describes Zocdoc's "Proposed Changes" to the rankings of spend-capped providers in searches performed by federal health care program beneficiaries. (AO 23-04 at 5.) For these patients, providers who reached their monthly spend caps would no longer be filtered from search results. (Id.) "Specifically, Providers who have reached their spending cap would appear in all search results for Non-Commercial Users[3] where they meet the Non-Commercial Users' search criteria, and Non-Commercial Users also would be able to view and click on the profiles of spend-capped Providers, although Users would not be able to book appointments with those Providers via the Marketplace at that time." (Id.) A clickable icon near the provider would explain that the provider had limited the number of bookings it could receive through Zocdoc but may be able to accommodate appointment requests if contacted directly. (Id.) Users could also click a "Notify Me" button to receive an automatic notification when new appointments became available. (Id.)

---

[3] "Non-Commercial Users" are defined to include beneficiaries of a federal health care program, as well as users who decline to provide their insurance-coverage information at the time of their search. (Id.)

AO 23-04 proceeded to describe Zocdoc's "machine learning" algorithm that ordered provider results in a way that matched user preferences.  (Id. at 6.)  The algorithm weighed 180 different criteria for users and providers, such as location, reason for visit and user ratings.  (Id. at 7.)  The algorithm considered whether users engaged with spend-capped providers.  (Id. at 7.)  Zocdoc certified to the OIG that for federal health program beneficiaries, the algorithm would not filter or prioritize providers based on amounts that providers paid to Zocdoc, the provider's current or historical use of spend caps, the volume or value of federal health care program business generated by the provider, or other "non-User-centric criteria." (Id.)  AO 23-04 recognized that "[u]nder the Proposed Changes, however, it is possible that the algorithm would use User-engagement data with spend-capped Providers to deprioritize such Providers, who, by virtue of setting a spending cap, are limiting the amount they are willing to pay [Zocdoc]."  (Id.)

In explaining why it was issuing "a favorable advisory opinion," the OIG stated that Zocdoc would be implementing "transparency safeguards" about the listing of spend-capped providers in its search results.  (Id. at 12.)  For federal health program beneficiaries, Zocdoc would discontinue filtering out spend-capped providers from search results and offer a text box that explained further details about the provider's potential availability for booking, as well as the option to receive notification when the provider was accepting bookings through Zocdoc. (Id.)  Essentially, spend-capped providers would appear in search results in a manner akin to any online directory, but patients would need to take the additional step of contacting the provider for an appointment instead of booking through Zocdoc.  (See id.)

The Complaint does not describe conduct by Zocdoc that is materially inconsistent with the activities described in AO 23-04.  The Complaint includes the screenshot of

an August 31, 2021 email to Sisselman, which stated that "new patients cannot find you on Zocdoc search until the beginning of September unless you update your spend cap." (Compl't ¶ 71.) That email predates AO 23-04 by almost two years. As noted, AO 23-04 identified as "Proposed Changes" Zocdoc's treatment of search results as they related to the listings of spend-capped providers in searches conducted by federal health program beneficiaries. AO 23-04 concluded that "OIG will not (with respect to the Existing Arrangement), and OIG would not (with respect to the Proposed Changes), impose administrative sanctions on Requestor in connection with the Arrangement under sections 1128A(a)(7) or 1128(b)(7) of the Act, as those sections relate to the commission of acts described in the Federal anti-kickback statute . . . ." (AO 23-04 at 13.)

    Sisselman does little more than apply conclusory labels to the exact practices and fees discussed by the OIG by saying that Zocdoc "secretly excluded" providers who did not pay new-patient fees and "affirmatively misled" patients about booking availability for spend-capped patients. (Compl't ¶¶ 6, 61, 68, 50, 52, 57-58 & Opp. Mem. 20.) Sisselman's descriptions of his attempt to search his own provider profile on Zocdoc while posing as a Medicare beneficiary are vague and conclusory. (Compl't ¶ 92.) The purported evidence cited by Sisselman pre-dates AO 23-04, and AO 23-04 described in detail how Zocdoc's then-existent policies limited the search result visibility of fee-capped providers. The OIG concluded that the "Proposed Changes" as described in AO 23-04 would not result in administrative sanctions.

    The Complaint does not plausibly allege that Zocdoc misrepresented to the OIG its practices related to fee-capped providers or has implemented fee caps in a manner materially inconsistent with AO 23-04. To the extent that its two FCA claims are premised on Zocdoc's policies pertaining to fee caps, the claims will be dismissed.

III.    <u>The Complaint Does Not Raise a Strong Inference of Scienter.</u>

Zocdoc urges that the Complaint does not plausibly allege that it acted with the scienter required by the FCA and the AKS.  <u>See</u> 42 U.S.C. § 1320a-7b(b).  It asserts that, drawing every reasonable inference in favor of the relator, the Complaint describes Zocdoc's efforts to comply with the AKS and obtain government approval prior to implementing the new-patient fee for federal health care program beneficiaries.

The Second Circuit recently discussed at length the <u>mens rea</u> requirement in an FCA action premised on a violation of the AKS.  <u>United States ex rel. Hart v. McKesson Corp.</u>, 96 F.4th 145, 153-59 (2d Cir. 2024).  It noted that the relator bringing an FCA claim must satisfy Rule 9(b), which requires facts "giv[ing] rise to a strong inference of fraudulent intent."  <u>Id.</u> at 153 (quotation marks omitted).  <u>McKesson</u> was issued while this motion was <u>sub judice</u>, and the parties have filed letter-briefs bringing the decision to the Court's attention.  (ECF 38, 41.)

As it used in the AKS, the term "willfully" requires proof "that the defendant acted with knowledge that his conduct was unlawful."  <u>McKesson</u>, 96 F.4th at 154 (quotation marks omitted).  The defendant need not have knowledge of "the <u>specific</u> law" that the conduct may be violating and "knowledge that the conduct is unlawful is all that is required."  <u>Id.</u> (emphasis in original; quotation marks omitted).  "[I]nterpreting 'willfully' to require that a defendant act understanding that his conduct is unlawful (if not necessarily under the AKS) accords with the general goal of criminal law to punish only those who act with a 'vicious will.' A more expansive interpretation would risk creating a trap for the unwary and deter socially beneficial conduct."  <u>Id.</u> at 155 (internal citation omitted).

In an effort "[t]o cabin the statute's broad reach," Congress authorized the OIG to "issue advisory opinions explaining whether the AKS reaches particular arrangements."  <u>Id.</u>

Along with these advisory opinions, HHS has codified 35 safe-harbor provisions under the AKS, and continues to add and modify safe harbor provisions. Id. "Thus, the reach of the AKS is far from settled," and the term "willfully" must be defined in a way that "avoids sweeping in . . . innocent conduct." Id. at 155-56. "Accordingly, we hold that the term 'willfully' in the AKS means what it typically means in federal criminal law. To act willfully under the AKS, a defendant must act with a 'bad purpose.' In other words, the defendant must act with knowledge that his conduct was unlawful." Id. at 157 (quotation marks and internal citation omitted); see also Pfizer, 42 F.4th at 77 ("Congress added the willfulness element to the AKS to avoid punishing 'an individual whose conduct, while improper, was inadvertent.'") (quoting H.R. Rep. 96-1167, at 59 (1980)). In determining whether a defendant acted with mens rea, a court may consider whether it sought an advisory opinion from the OIG. See MedPricer.com, Inc. v. Becton, Dixon & Co., 2017 WL 1234102, at *2 (D. Conn. Apr. 3, 2017) (noting defendant's failure to seek advisory opinion).

Here, Sisselman's complaint reveals that two Advisory Opinions were obtained by Zocdoc that gave detailed consideration to its implementation of new-patient fees. Both Advisory Opinions stated that Zocdoc's use of the fees "implicated" the AKS but concluded, based on a variety of combined factors, that they presented a low risk of fraud and abuse. As noted, courts and regulators have been mindful of the potentially broad sweep of the AKS and have endeavored not to interpret the AKS in a manner that penalizes innocent conduct. Based on the face of the Complaint, Zocdoc proactively applied for AO 19-04 before it implemented new-patient fees on providers who served the beneficiaries of federal health program. It then applied for AO 23-04 after Sisselman submitted materials related to the search rankings of spend-capped providers. The OIG closely evaluated Zocdoc's fee regime, considered the reach of the AKS and

concluded that no administrative action was required because the risk of fraud and abuse was low.

The loose phrasings of Zocdoc account managers seeking to secure Sisselman's business and the language used in company emails do not raise a strong inference that Zocdoc acted with an intent to mislead the OIG or that it otherwise had knowledge that its conduct has been unlawful under the AKS or any other law. Rather, the Complaint describes an effort by Zocdoc to comply with the AKS and to receive the OIG's approval before embarking in a practice that risked violating the AKS.

Because the Complaint does not raise a strong inference of fraudulent intent or otherwise allege with particularity that Zocdoc engaged in a willful violation of the AKS or any other law, its claims will be dismissed.

LEAVE TO AMEND IS DENIED.

Sisselman urges that he should be given leave to amend in the event that any portion of Zocdoc's motion is granted. (Opp. Mem. at 25.) Sisselman has already filed three iterations of his complaint. With Zocdoc's motion to dismiss in hand, Sisselman does not explain what he would add to cure the deficiencies outlined in Zocdoc's motion. His request for leave to amend will be denied.

"Although Rule 15(a) of the Federal Rules of Civil Procedure provides that leave to amend 'shall be freely given when justice so requires,' it is within the sound discretion of the district court to grant or deny leave to amend. A district court has discretion to deny leave for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party." McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 200 (2d Cir. 2007) (citations omitted). Leave to amend is futile if the plaintiff's "proposed amendments would fail to cure prior

deficiencies or to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure."

Panther Partners Inc. v. Ikanos Communications, Inc., 681 F.3d 114, 119 (2d Cir. 2012).

"[A] district court is under no obligation to grant leave to amend when the

plaintiff offers merely conclusory assertion[s] that amendment would cure a complaint's

deficiencies and fail[s] to disclose what additional allegations [he] would make which might lead

to a different result." Abe v. New York Univ., 2016 WL 1275661, at *11 (S.D.N.Y. Mar. 30,

2016) (Sullivan, J.) (quotation marks omitted; alterations in original). "The Second Circuit has

consistently held that district courts may deny leave to amend when a plaintiff requests such

leave in a cursory sentence on the last page of an opposition to a motion to dismiss, without

offering any justification or attaching a proposed amended pleading." Cinema Village Cinemart,

Inc. v. Regal Entertainment Group, 2016 WL 5719790, at *7 (S.D.N.Y. Sept. 29, 2016)

(Sullivan, J.), aff'd, 708 Fed. App'x 29 (2d Cir. 2017) (collecting cases).

Sisselman filed the Second Amended Complaint after an exchange of pre-motion

letters and a pretrial conference. (ECF 26, 29.) Sisselman does not now identify what

amendments he proposes to make, stating only that he "should be permitted an opportunity to

amend his pleading to correct any perceived deficiencies." (Opp. Mem. at 25.)

He also notes that Zocdoc moved to dismiss in part on the alternative grounds that

the Second Amended Complaint does not plausibly allege materiality as to any claimed act of

non-compliance by Zocdoc and a resulting federal payment decision, noting that this "new

materiality argument" was not raised in pre-motion practice. (Id. at 25 n.26.) But the Court did

not address Zocdoc's materiality argument and it forms no basis for the dismissal of the Second

Amended Complaint.[4]

Because Sisselman already filed two amendments to his pleading and because he

has not identified how he would amend to meet defendant's arguments, his request for leave to

amend is denied.

CONCLUSION.

The motion is dismiss is GRANTED.  (ECF 30.)  The Clerk is respectfully

directed to terminate the motion, close the case and enter judgment for the defendant.

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
        September 26, 2024

---

[4] Zocdoc urged that the Complaint should be dismissed because Sisselman failed to plausibly allege that any claimed act of non-compliance with either Advisory Opinion was material to a government payment decision.  Sisselman responded with citations to support the proposition that a violation of the AKS is material to government payment decisions as a matter of law.  See, e.g., United States v. Teva Pharms. USA, Inc., 2019 WL 1245656, at *28 (S.D.N.Y. Feb. 27, 2019) (for payment claims submitted after 2010 amendment to the AKS, "there is no need for an independent assessment of materiality.") (McMahon, J.).  Zocdoc's reply memorandum acknowledged a split in authority on the issue and indicated that the Second Circuit has not spoken on the materiality requirement as it pertains to a government payment decision on an AKS violation.  (See Reply at 9.)  There is no need for the Court to reach this alternative grounds for dismissal.  The issue of materiality as it relates to government payment decisions is not to be confused with the Court's references to the absence of allegations that describe a material deviation or inconsistency by Zocdoc from the OIG's Advisory Opinions (see supra pp. 18, 20, 21).